IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 20, 2019 Session

## STATE OF TENNESSEE v. STEPHANIE BROWN

**Appeal from the Circuit Court for Sevier County**
**No. 21718      Rex H. Ogle, Judge**

——————————————————————

## No. E2019-00223-CCA-R3-CD

——————————————————————

A Sevier County Jury found Defendant, Stephanie Brown, guilty of reckless homicide. The trial court imposed a sentence of four years to be served in confinement.  On appeal, Defendant raises the following issues: (1) whether the trial court properly admitted testimony about the hydrostatic or float test performed on the baby's lungs; (2) whether the trial court properly admitted Defendant's confession and denied her motion to dismiss the indictment; (3) whether the evidence was sufficient to support Defendant's conviction for reckless homicide; and (4) whether the trial court properly sentenced Defendant. Upon reviewing the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JJ., joined.

Edward C. Miller, District Public Defender, Dandridge, Tennessee, for the appellant, Stephanie Marie Brown.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; James B. (Jimmy) Dunn, District Attorney General; and Tim Norris, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## BACKGROUND

*Pretrial Daubert Hearing*

Defendant filed a pretrial "MOTION REQUESTING DAUBERT HEARING" seeking to exclude Dr. Amy Hawes' testimony concerning the "float" test that was performed on the victim's lungs and to hold a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993), to determine the relevance and reliability of Dr. Hawes' testimony.

At the pretrial hearing, Dr. Hawes testified as an expert in forensic pathology. She explained that one of the tests that forensic pathologists are trained to conduct to determine whether a child is stillborn or born alive is called the flotation (float) or hydrostatic test. She said that the float test is a very simple test during which the lungs are removed and placed in a bucket or container of water. If the lungs float, it can be an "indicator in certain circumstances of live birth." If the lungs do not float, "it can be an indicator that the child was potentially stillborn." Dr. Hawes further testified: "There are some caveats to the interpretation of the hydrostatic test, but in the simplest of terms, that's what it means." Dr. Hawes performed the float test in this case, and her autopsy findings on the baby girl were indicative of a live birth and that the baby died of asphyxia. In determining that the baby was born alive, Dr. Hawes found that her lungs were fully inflated and floated in water.

Dr. Hawes agreed that there are circumstances when the float test is less reliable than other tests, such as when a child is decomposed. In that circumstance, the gas produced causes the lungs to float which in turn causes a potential false positive result. Dr. Hawes noted that mouth-to-mouth resuscitation may also cause a false positive. She testified that there are also false negatives with the float test where a child is documented to have been born alive but their lungs sink during the float test. Dr. Hawes testified that she did not find any type of decomposition present in the baby in this case, and to her knowledge no mouth-to-mouth resuscitation was performed on the child. As far as she knew, chest compressions would not affect the validity of the float test. Dr. Hawes explained that a false positive means that the lungs float on a child that was actually stillborn. A false negative means that the lungs sink on a child that was live born.

Dr. Hawes testified that the float test has been around for "a long, long time." She noted that in medical literature "there are multiple articles about discussing its usefulness and its limits and in what context it must be interpreted." Dr. Hawes was familiar with a study from the International Journal of Legal Medicine published in 2013 titled, "Is the lung floating test a valuable tool or obsolete? A prospective autopsy study." She

testified that the study was done on infants who were autopsied in which the float test was performed. The findings of the study were summarized as follows:

> The study proves that for contemporary medicine, the lung floating test is still a reliable indicator of a newborn's breathing. As there was no false-positive result, [. . .] a wrongful conviction for killing a newborn just on behalf of the floating test cannot be expected. On the other hand, the study shows a negative floating test result is not proof for a stillbirth. Summing up the study allows the advice to still perform the lung floating test in every medicolegal investigation with the uncertainty, if a newborn has breathed or has not. The known restrictions, as well as study's findings, must be taken into account, however.

Dr. Hawes noted that 194 stillborn babies were tested in the study, and none of the lungs floated indicating a false positive result. Fourteen additional babies in the study were verified to have been born alive and lived for two days up to ten months. The lung floating test was positive in ten of fourteen cases. Dr. Hawes testified:

> Four times it showed a negative result, although life and breathing had been reported by medical staff. In all of these four cases, the whole lung, as well as the separated left lung and right lung and single pieces from both sides sank; no piece was able to swim. These four newborns were born prematurely between the 27[th] and 35[th] week of pregnancy.

Dr. Hawes agreed that the four cases indicated a false negative result, a twenty-nine percent rate of error. She asserted that false negatives are not an issue in Defendant's case.

Dr. Hawes testified that she has been employed by three different medical examiner's offices during her career, and they all employed the float test to determine whether an infant was born alive or stillborn. Dr. Hawes also identified the "Handbook of Forensic Pathology" produced by the College of American Pathologists. She noted that the book also discussed the float test as one test used in the context of an overall investigation to determine live birth versus stillborn. Dr. Hawes testified that she had not performed the float test very often because she does not often investigate whether a live birth occurred.

On cross-examination, Dr. Hawes agreed that the float test has caused controversy and discussion. She further agreed that the float test is not perfect and that it has limitations and must be interpreted in the appropriate context. Dr. Hawes acknowledged that the float test is a simple test, "[b]ut just because the lung floats doesn't mean that I'm going to state to a medical certainty that the child was born alive." Likewise, Dr. Hawes

- 3 -

testified that she would not say that a child was stillborn solely because the lungs sank. She reiterated that "it has to be taken in the context of all the other findings."

Dr. Hawes acknowledged that she did not follow the steps recommended by Chris Milroy, a forensic pathologist. in his publication for conducting the float test. Rather, she relied on the "Handbook of Pathology, Second Edition." Dr. Hawes testified that she performed the test the way that she was trained at Vanderbilt University which was the current recommended way. Dr. Hawes was also familiar with a book titled "Knight's Forensic Pathology." She acknowledged that an article in the textbook indicates that there are too many false positive and false negative results to allow the float test to be used in a criminal trial. The article concluded that is it "pointless to apply the hydrostatic [float] test, which will impair the material for other and more important investigations."

Dr. Hawes acknowledged that the article also indicated that attempts at resuscitation such as mouth-to-mouth, external cardiac massage, and the administration of oxygen "completely negate any of the already fragile tests for respiration in a newborn infant." Dr. Hawes pointed out that chest compressions were done in the present case, and she did not consider that to be external cardiac massage because artificial respiration was not given. She again stated: "[D]espite its limitations, in my training and experience and based on my reading of the medical literature, is that you still do the [float] test, but you interpret the findings in context of everything else you know about the scene investigation and autopsy." Dr. Hawes agreed that movement of the baby's body by others could potentially cause air to enter the baby's lungs. Dr. Hawes also acknowledged a case report by Greg Davis, a forensic pathologist, in which Dr Davis stated that the float test was unreliable in unattended births. She interpreted Dr. Davis' statement to mean that there are restrictions to the interpretation of the float test and that he was discussing the results of the test as applied to his particular case.

Anna Mooney testified that she never heard the baby cry before learning that Defendant had given birth in the bathroom. She said that the baby was in a plastic bag with towels on top. She removed the towels and performed chest compressions with two fingers on the baby for approximately thirty seconds. Ms. Mooney testified that Matthew Mooney then took the baby, who was still in the bag, and placed her in a box.

Dr. Thomas A. Andrew, a forensic pathologist at White Mountain Forensic Consulting Services, testified as an expert in forensic pathology. He is also a board-certified pediatrician. He reviewed the autopsy performed in this case, the preliminary hearing testimony, an interview, and pictures and microscopic slides of the baby's lungs. He disagreed with Dr. Hawes' findings that the baby was born alive. He found the float test particularly troubling and that it should not be relied upon. He testified that the float test has been used regularly since the 15th century, and "[i]t is a staple in everybody's training. It is almost expected in the conduction of these autopsies." Dr. Andrew asserted that the float test has yielded both documented false positive and false negative

results when the test is applied.  He testified that the test is not as widely accepted in Anglo-Saxon countries as it is in Germany and that it "doesn't have a scientific evidence base to back up its reliability."

It was Dr. Andrew's opinion that the chest compressions performed by Anna Mooney negated the results of the float test in this case.  He noted that the more a body is handled, the more air can be introduced into the lungs.  Dr. Andrew testified that the slides of the baby's lungs showed that the lower corner of the lungs was not as well expanded which to him represented patchy aeration.  He also testified that what Dr. Hawes referred to as hemoaspiration in the lungs, he would have interpreted as petechiae, which can occur in the lungs or under the scalp for any number of reasons including birth.  Dr. Hawes testified that there was nothing specific in the slides that would "allow [him] to opine that the child was born alive without any other possibility[.]"  He noted that the baby's lungs looked mottled to him as opposed to fully expanded pink lungs.

Dr. Andrew testified concerning a British technique used to perform the float test where the "pluck," which consisted of the lungs and heart with the neck organs attached, is floated.  He said that Dr. Hawes did not use the whole pluck but only used the baby's lungs and air passages.  Dr. Hawes testified that the literature is "all over the place" about how to float the pluck.  He agreed that the pictures of the baby's lungs in this case showed the lungs floating.  Dr. Andrew testified that the theory behind the float test is that "air is lighter than blood or tissue, and, therefore, the air in the lungs would provide the buoyancy . . . to keep those lungs up on the surface.  A non-inflated lung would sink because it's heavier.  It's not made buoyant by air."  Dr. Andrew agreed that it is possible for an infant to breathe during the birthing process and that petechiae in and of itself is not indicative of a live birth.

On cross-examination, Dr. Andrew clarified that the float test is also generally accepted in Anglo-Saxon countries, but it is "hugely controversial" and has been debated for many years.  Dr. Andrew further testified that the float test is commonly performed but "there are a myriad of caveats involved with it that makes it, in the minds of some forensic pathologists, relatively unreliable."  He admitted that he had been trained to conduct the test.  Dr. Andrew noted that Dr. Hawes was correct in pointing out that the test must be interpreted against the background of other data, which he agreed is true of most tests conducted in forensic pathology.  He testified: "It's a matter of how much weight to give it in terms of interpreting what it means in the context of your individual case.  And I have found and agree with most authors who find it so larded with caveats that it is hardly worth the effort."  Dr. Andrew testified as to how he was trained to conduct the float test, and he agreed that it was fair to say that forensic scientists are trained differently in different schools and in different areas in how to perform the test.  He agreed that false positive results were at issue in this case.  He also agreed that he did not find any evidence of putrefaction in this case.

Dr. Andrew testified that he was not given Defendant's statement in which she said that she had placed her hand over the baby's mouth and nose. Dr. Andrew said that he did not make any findings concerning that baby's death and that it was "entirely undetermined as to whether or not this baby was live born or still born." When asked if the admission of the float test would substantially assist the jury in this case, Dr. Andrew replied: "I think given the unreliability of the [float] test, I think a confused jury would not find it very helpful at all."

The trial court denied Defendant's motion and allowed Dr. Hawes to testify finding that the testimony concerning the float test met the standards of admissibility under *Daubert* and that if the jury accepted the test as true, accurate, or helpful that it "would very much substantially assist the trier of fact."

*State's Proof at Trial*

Bobby H. Laws, Jr. testified that he and Defendant became romantically involved while the two were working together, and Defendant eventually began staying with him in the home that he shared with his mother Lisa Mooney, brother Matthew Mooney, and sister-in-law Anna Mooney in Kodak.

On January 13, 2016, Defendant woke up and complained that her stomach was hurting, but she refused to see a doctor. Later than night, sometime between 10:00 and 11:00 p.m., Defendant told Mr. Laws that she was going to take a shower. Mr. Laws fell asleep and woke up at 12:30 a.m. because the dog was barking. He did not see Defendant, and he got up to look for her. Mr. Laws walked through the house and did not see Defendant. Although the bathroom door was shut, Mr. Laws saw a light under the door and assumed that Defendant was still in the bathroom. Mr. Laws testified that he laid back down in the bed, and Defendant walked out of the bathroom and into the bedroom. He said that Defendant told him that she had just given birth to a stillborn baby, later determined to be a girl. Mr. Laws testified that he asked Defendant where the baby was located, and she said that the baby was still in the bathroom. Mr. Laws testified that he got dressed and started his truck while the Defendant walked back into the bathroom.

Mr. Laws said that Defendant eventually walked back into the bedroom and stood at the end of the bed. He testified:

> And I said, "We need to go to the hospital." And she kind of just stood there. I don't know if she was in shock or what. She had this, like, vague look on her face like she was there physically but not, like, mentally there. And I was like - - I said, "We need to go. We need to go to the hospital now." And I said, "Get some clothes on." And she starts - - like, she slowly starts getting her clothes, and I guess she was - - must

- 6 -

have been still in shock or something. And after that, it's kind of a little blurry.

Mr. Laws said that he told Defendant to swaddle the baby in some towels, and he also grabbed a box. Mr. Laws testified that he, Defendant, and Matthew and Anna Mooney got into the truck with the baby, and Mr. Laws drove them to the LeConte Medical Center in Sevierville. Defendant testified that he did not see Defendant again until the following day in her hospital room. He did not see his baby daughter again until the funeral. Mr. Laws denied that he looked into the bathroom the night that Defendant gave birth or that he cleaned the bathroom. He said that Defendant did not need help getting dressed after she gave birth or help getting in or out of the truck when they went to the hospital. Mr. Laws testified that approximately one to one and a half months before Defendant gave birth, he "jokingly" asked her if she was pregnant, and she said no. He noticed that Defendant had gained a little weight, and she told him that she thought she had a hernia.

On cross-examination, Mr. Laws testified he was aware that Defendant had discussed with her mother whether she might have a hernia. There was also a discussion on the day that Defendant gave birth that she did not feel well because she thought that she had food poisoning from eating at a restaurant.

Matthew Mooney testified that he and Anna Mooney were sitting on the couch watching television late at night on January 13 when Defendant went into the bathroom and remained for a long time. At some point, Mr. Laws walked out of his bedroom and used the remote to start his truck. Mr. Mooney asked Mr. Laws what was going on, and Mr. Laws eventually told him that Defendant had given birth in the bathroom and that the baby was dead. Anna Mooney then went into the bathroom to determine what had happened. Mr. Mooney later looked into the bathroom and saw the baby on the counter in a trash bag. He said that they considered whether to drive the baby to the hospital or wait for an ambulance but they chose to drive her to the hospital. Mr. Mooney noted that they decided to place the baby in a box so that no one else would see her when they took her into the hospital. Mr. Mooney testified that the bathroom was "very, very clean."

On cross-examination, Mr. Mooney noted that Defendant did not appear to be pregnant, and he had no "clue" that she was pregnant. He agreed that Defendant was a quiet person who did not talk to a lot of people. He said that she was normally in Mr. Laws' room when she was in the house. Mr. Mooney testified that everyone was thinking "erratically" after learning that Defendant gave birth.

Anna Mooney testified that she knocked on the door while Defendant was in the bathroom and asked to come in, and Defendant said yes. Mrs. Mooney looked down and noticed two garbage bags in front of Defendant. She asked Defendant if everything was alright, and Defendant told her that she had delivered a stillborn baby. Defendant

- 7 -

appeared to be in shock and pointed at the garbage bag. Mrs. Mooney opened the bag and found the baby underneath some towels. She attempted to resuscitate the baby by doing chest compressions with her two fingers but she stopped after the baby did not respond. Mrs. Mooney testified that she then hugged Defendant. She said that Mr. Mooney came into the bathroom and took the baby and the other trash bag containing the placenta and placed them in a box. Defendant and the baby were then taken to the hospital. Once they arrived at the hospital, Mrs. Mooney gave the baby girl, who was still in the box, to a nurse who began crying when she looked inside, and the nurse gave the baby to another nurse. Defendant and the baby were taken to the back, and Mrs. Mooney did not see Defendant again at the hospital. Mrs. Mooney admitted that no one at the house called 911 after discovering the baby.

On cross-examination, Mrs. Mooney testified that she had no idea Defendant was pregnant. Mrs. Mooney described Defendant as "a really anxious person." She also said: "[Defendant] was really quiet, wouldn't really talk, and I know she hated big crowds. Driving made her nervous."

On re-direct examination, Mrs. Mooney testified that Defendant told her at the hospital that she was nervous about her cell phone because she had looked up "baby stuff." She said that Defendant was nervous about going to jail because of the phone.

Dana McIlwain was working as a registered nurse at the LeConte Medical Center during the early morning hours of January 14, 2016, when Defendant came into the emergency room. She described Defendant as having a "flat effect," which meant that she showed no emotion.

Detective Maria Cutshaw of the Sevier County Sheriff's Office was assigned to investigate the present offense. She spoke by phone to a nurse at the LeConte Medical Center and then drove to the hospital arriving at approximately 3:00 a.m. Detective Cutshaw spoke with a nurse at the hospital who briefed her on what happened. Detective Cutshaw then spoke to Defendant who was waiting in a room within the emergency room. Detective Cutshaw testified that she saw the newborn baby in an adjacent room in an Amazon Prime box. She noted that there were two different bags in the box with one containing the baby. The placenta was in the other bag. Detective Cutshaw spoke with someone from the medical examiner's office, and it was determined that an autopsy needed to be performed on the baby. Detective Cutshaw later went to the Mooney residence and spoke with Lisa Mooney. She allowed Detective Cutshaw inside to look around and take photographs.

Detective Cutshaw testified that after reviewing findings from the autopsy report, she re-interviewed Defendant on March 22, 2016, at the sheriff's office. Defendant initially denied knowing that she was pregnant before giving birth, and she claimed that the baby was not breathing and did not have a pulse when she was born. Defendant

eventually admitted that she realized her pregnancy a few weeks before giving birth. She then admitted that she killed her newborn baby by placing her hand over the baby's mouth and nose a few minutes after she was born. Defendant said that the baby had moved a little and had moved her arm. She told Detective Cutshaw that she did not know why she stopped covering the baby's mouth, but after a few minutes she checked the baby's pulse and found none. She then realized that the baby was dead. Defendant said that she placed the baby in one bag and put the placenta in another. She also put the bath mat in one of the bags. Defendant said that she sat in the bathroom for a long time and then cleaned the room. She asserted that she was in shock. Detective Cutshaw testified that a search warrant was executed on Defendant's cell phone but they were unable to obtain any internet browsing history from the phone.

Dr. Amy Hawes is a forensic pathologist at the Knox County Regional Forensic Center. She performed an autopsy on the baby girl in this case. Dr. Hawes determined that the baby was born at term or near term. She noticed a faint blue contusion around the baby's left eye. Dr. Hawes testified:

> So there were several findings of note that taken together, in total, the findings led me to believe that this was a live-born infant, and those findings included inflated lungs. So the lungs contained air. There was petechiae, which is the term for tiny busted blood vessels, and those were found beneath the scalp. The term for that is subgaleal. It just means beneath the scalp. And there were also petechiae, or little tiny busted blood vessels, on the lining of the lung.

When asked how she determined that the baby's lungs were inflated, Dr. Hawes further testified that she relied on direct visual inspection of the lungs, and from sixteen years of performing autopsies, she had learned what inflated lungs looked like. Dr. Hawes also relied on a microscopic examination of the baby's lungs. She said that under the microscope, the baby's lungs appeared uniformly inflated and the lungs of a stillborn will not appear uniformly inflated. Dr. Hawes testified that the baby had blood in her lungs which indicated that she had breathed or had air in her lungs. Additionally, Dr. Hawes performed a float test.

Dr. Hawes summarized her findings in the autopsy report as follows:

> [T]he term infant was live-born. There were no blunt trauma injuries, no congenital anomalies, which means the body was normally developed, and there were no other histologic or microscopic findings to explain death. Given the infant was placed in a plastic bag after birth, suffocation is the most likely cause of death. Other forms of asphyxia, such as smothering, cannot be excluded.

Dr. Hawes testified that she was later advised that Defendant admitted to placing her hand over the baby's mouth and nose after birth, which was consistent with her findings in the autopsy report.

On cross-examination, Dr. Hawes testified that the float test is a very simple test that "has been around for hundreds of years." She described the test as follows:

> But, in summary, the way I was trained to do it, is when the lungs are removed, you place the lungs in a container of water. Some people do it both lungs in the same container. Some people separate them. Some people do it with the heart still attached. Some people do them separately. But you put it in water, or some other liquid, like formalin, which is a liquid preservative. And if they float, the lungs float, it could be an indicator of a live birth; and if they sink, it can be an indicator of a stillbirth.

Dr. Hawes noted that the float test was not a perfect test and could produce both false negative and false positive findings. She also testified that "modern medicine agrees that we don't rely on that one test to absolutely decide whether an infant is live-born or stillborn. It's just one test that we are trained to do and one piece of information that we use in the context of the overall findings." Dr. Hawes testified that she based her autopsy findings on the totality of "[t]he history, the confession, or purported confession, the autopsy findings, and all the other studies." It was Dr. Hawes' opinion that the manner of death of the baby was homicide.

*Defense Proof*

Dr. Thomas Andrew, a forensic pathologist, testified that he reviewed Dr. Hawes' findings but not to determine the baby's cause of death. He said: "My charge in this case was to look at the medical evidence as presented by the autopsy to reach some sort of opinion, if possible, as to whether or not the infant was live-born or stillborn." Dr. Andrew noted that a lack of prenatal care and an unattended delivery all increase the possibility of stillbirth in a pregnancy.

Dr. Andrew disagreed with Dr. Hawes' findings that the baby was born alive. He did not believe that the petechiae he observed in the baby rose to "the level of allowing a determination of live birth." He noted that the petechia, which was mainly on the surface of the baby's lungs, could appear passively "just as a matter of pressure passing through the birth canal, and underneath the scalp, may well be caused some - - in some cases by simply reflecting the scalp during autopsy." Dr. Andrew reviewed the images of the baby's lungs and noted that the lungs were "relatively mottled" which meant that there were alternating areas of red and pink. To Dr. Andrew this meant that the lungs were incompletely or irregularly aerated or not fully inflated, and "[t]he infant had not taken

- 10 -

robust breaths or anything of that nature." Dr. Andrew testified that partial inflation of the baby's lungs could have been caused by "decomposition or postmortem putrefaction of tissue" or some attempt to resuscitate the baby by mouth-to-mouth resuscitation or chest compressions. He also noted that "handling of the body of an infant after birth can artificially introduce various amounts - - or varying, I should say, amounts of air into the respiratory tract." Dr. Andrew noted that approximately ten people handled the baby's body prior to the autopsy.

From the photographs of the baby's lungs, Dr. Andrew disagreed with Dr. Hawes' finding that the victim's lung was a well-inflated lung. Dr. Andrew further opined: "I have no reason to doubt that there was hemoaspiration, but on the basis of that image, from that part of that lung against the whole, does not allow me to reach a conclusion that this was a live birth." Dr. Andrew testified that he had training in conducting the float test. He noted that the test was a very old one which dated back to the 15th century. Dr. Andrew noted that there have been many modifications of the test to overcome known deficiencies of the test which led to false negatives and false positives. According to Dr. Andrew, the float test should be "used with great caution, and as Dr. Hawes has pointed out, in conjunction with a lot of other information. In and of itself, it is not a reliable guide as to live-birth versus stillbirth."

On cross-examination, Dr. Andrew testified that he reviewed the autopsy report, the slides, and the ancillary studies in this case. He agreed that in conducting an autopsy, it is important to rely on case histories and witness statements, not solely on medical findings. He acknowledged that a mother's statement indicating that she had seen her baby's arms move and then placed her hand over the baby's nose and mouth would "certainly have to be considered." Dr. Andrew agreed that he was not saying that the baby was stillborn. He further testified: "I think the medicine as presented by this autopsy is insufficient to explain live birth versus stillbirth regardless of the placement of either the body or a breathing, albeit depressed infant in a plastic bag. The medicine can't overcome the ambiguities of the findings here."

Donnie Brooks testified that Defendant worked for him for approximately one year when he was an assistant manager at Cracker Barrel. He said that Defendant had some issues with anxiety, and "large crowds would bother her somewhat" and cause her to have shortness of breath. Cheryl Eakin also worked with Defendant at Cracker Barrel for approximately one year, and they later worked at Pottery House together. She last saw Defendant approximately one month before Defendant gave birth, and she had no suspicions that Defendant was pregnant. Ms. Eakin testified that Defendant was a friendly person but very anxious.

April Martin, Defendant's grandmother, testified that Defendant was an introvert, and she had anxiety but did not take medication for it. She noted that Defendant had always maintained employment and was not a troublemaker. On cross-examination, Ms.

Martin was not certain that Defendant had been diagnosed with anxiety, "[s]he just exhibited all of the symptoms."

Dr. Laura Berardi is an OB-GYN at LeConte Medical Center who treated Defendant on January 14, 2016. Defendant told Dr. Berardi that she delivered a stillborn baby and had only thought that she had a hernia. Dr. Berardi noticed that Defendant had a "very flat effect" and a "kind of vacant appearance." Her notes indicated that Defendant was very pale when she first arrived at the emergency room and could not give her name. Dr. Berardi said that Defendant was able to answer some of her questions but was not very detailed. She was concerned about Defendant's mental status and consulted with a social worker due to Defendant's lack of any emotion. Dr. Berardi further asserted that "you don't see that after you deliver a dead baby." On cross-examination, Dr. Berardi described Defendant as "[n]ot very forthcoming and no emotion" when she responded to Dr. Berardi's questions.

Samantha Brown, Defendant's mother, testified that Defendant was an introvert, and she began complaining that she felt anxious and stressed at work. Defendant told her that she would start sweating and "freak out." Ms. Brown testified that she received a text message from Defendant at approximately 11:00 a.m. on January 14, 2016, that read: "Mom, I'm at the hospital. The strangest thing happened last night. I delivered a dead baby." Ms. Brown testified that Defendant never told her that she was pregnant, and Defendant did not appear to be pregnant. She said that Defendant was wearing the same size clothing at the time that she gave birth as she always wore.

Ms. Brown testified that she and Defendant had both discussed that Defendant had a hernia, and Defendant told her that she aggravated the hernia at work. The day before Defendant gave birth, Ms. Brown had decided that she was going to take Defendant to the emergency room. She called Defendant at approximately 4:00 p.m. about going to the hospital, and Defendant said that she was very sick due to food poisoning. Ms. Brown testified that she visited Defendant in the hospital after she gave birth, and Defendant was in shock. She admitted that she told police that Defendant had no emotion, and that "[i]t was just as if she was telling us what she had made for dinner the night before."

Dr. Bruce Frumpkin, a clinical and forensic psychologist, testified that he evaluated Defendant's "psychological vulnerabilities as it relates to other people to see whether she is at a higher risk than the average person of giving a false confession." He clarified that he would not be offering an opinion as to whether or not Defendant gave a false confession. Dr. Frumpkin testified as to the five reasons why someone would falsely confess to a crime that they did not commit. He noted that false confessions are based upon individual psychological vulnerabilities and interrogation tactics, and "the combination of both acting together." On March 17, 2017, Dr. Frumpkin conducted an evaluation of Defendant in his office in Philadelphia. He also reviewed the audio and

- 12 -

video recordings of Defendant's interrogation with law enforcement and the transcripts of the recordings, various court-related filings and motions, Defendant's school and employment records, and information from another forensic psychologist hired by defense counsel to evaluate Defendant. He also reviewed Defendant's medical records.

Dr. Frumpkin testified that he saw Defendant for a total of six hours during her evaluation, which included some self-administered testing time. He stated that Defendant is more vulnerable than the average person to give a false confession. Dr. Frumpkin testified that testing showed Defendant "functions at the low average to average range of intelligence overall. So her intellectual functioning in particular is not necessarily a risk factor, but what is a risk factor is her concentration and memory." Dr. Frumpkin testified that Defendant is very anxious, depressed, socially avoidant, and hypersensitive to sounds. He noted that a very anxious person is going to have a harder time with memory and concentration. Dr. Frumpkin pointed out that Defendant was in a state of shock at the emergency room, and she asserted to law enforcement that her memory as to what happened was not good because she was upset. He said: "So that becomes a major risk factor for someone succumbing to suggestions from law enforcement, you know, that the events did not happen the way you say they happened." Dr. Frumpkin testified that at some point, Defendant began to doubt her own memory as to what happened and began to "incorporate into her memory what law enforcement is telling her is what really happened."

Dr. Frumpkin diagnosed Defendant as having a generalized anxiety disorder and avoidant personality disorder. He agreed that she was also having acute stress disorder at the time that she gave birth, and it "would have been very hard for her to be able to encode information in her memory at the time she was having this acute stress disorder[.]" Dr. Frumpkin testified that this would have caused Defendant to have "patchy memory" of what really happened at the time of the baby's birth.

On cross-examination, Dr. Frumpkin testified that Defendant was the first to mention suffocation during her interview with Detective Cutshaw. That was after Detective Cutshaw told Defendant that the baby was born alive and then died of asphyxiation. Dr. Frumpkin testified that "after a number of denials, eventually [Defendant] gave an explanation of how the baby could have died, but initially she rejected having anything to do with the baby's death, saying it was born already dead." Dr. Frumpkin admitted that Defendant told the nurses at the hospital that she cleaned the bathroom after giving birth because it "looked like a crime scene." He agreed that Defendant's judgment and common sense were poor.

- 13 -

**ANALYSIS**

I.      *Admission of Testimony about the Hydrostatic, a/k/a Float, Test*

Defendant argues that the trial court erred by admitting testimony concerning the hydrostatic, a/k/a float test which was used in part to determine whether the baby was born alive or stillborn. She contends that the float test is not reliable or scientifically valid. We disagree.

Expert testimony, like other evidence, must be relevant in order to be admissible. *See* Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Relevant evidence is defined as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. This court reviews a trial court's decisions concerning the admissibility of expert evidence under an abuse of discretion standard, and will reverse a decision only "'when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" *State v. Parker,* 350 S.W.3d 883, 897 (Tenn. 2011) (quoting *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

The admission of expert testimony is governed by Tennessee Rule of Evidence 702, which provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. "The witness may acquire the necessary expertise through formal education or life experiences." *State v. Reid*, 91 S.W.3d 247, 302 (Tenn. 2002) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 7.02[4] (4th ed.2000)). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." *Id*. The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002) (emphasis omitted).

In *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997), our supreme court recited several nonexclusive factors that a court may consider in determining the reliability of scientific testimony, including:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of

error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 274 (Tenn. 2005) (quoting *McDaniel*, 955 S.W.2d at 265). Not all expert testimony will "fit" with these factors, thus the exact considerations that may be appropriate will vary depending upon "the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony." *Brown,* 181 S.W.3d at 277. Our supreme court has stated, "Where the expert's testimony is otherwise reliable and experts in the field would reasonably rely upon such evidence, concerns are more properly addressed through vigorous cross-examination rather than exclusion of the testimony." *State v. Scott*, 275 S.W.3d 395, 409 (Tenn. 2009).

The trial court, in determining that testimony concerning the float test was admissible, noted that the testimony was troublesome. The trial court concluded:

> And as we sit here, I certainly wish there was a better test. Now, granted, this test is not conclusive of anything. The Court is not here - - and everybody gets their hackles up - - but I'm not here to determine what was true and what was not true. That's for the jury to determine. This is a classic case of experts in disagreement, and I understand that. And, you know, we'll see what happens. But this is a classic case of the weight as opposed to the admissibility, because I do think that based upon the testimony that this Court has heard that the test meets the standards of admissibility under Daubert and under McDaniel. And specifically - - I mean, you know, would it substantially aid the trier of fact? It would appear to me that if they accept it as true, the test as accurate, or the test as helpful, that it would very much substantially assist the trier of fact.
>
> And, you know, I can understand and I can see where there is a great debate on this and there's a lot to be said about it, and the question - - but based upon what I've heard, this test is used. It's been debated, heavily debated. Some say it's the greatest thing since sliced bread, and the other one says it's junk science. I mean, that's - - you know, so that's why you have experts who testify and give their opinions, and that's why the jury has to decide if they rely upon those expert opinions and what weight, if any, they choose to give it.
>
> And so for those reasons, the Court finds that the evidence as it relates to the test is admissible and may be considered by the jury.

The trial court did not abuse its discretion in admitting testimony concerning the float test. Both Dr. Hawes and Dr. Andrew agreed that the float test is a very simple test that has been used regularly since the 15th century, and it is generally accepted. The test is based on the fundamental principle that air is lighter than blood or tissue. Therefore, lungs inflated with air will float when placed in water, and Defendant does not challenge this principle. In fact, Dr. Andrew testified that the float test "is a staple in everybody's training. It is almost expected in the conduction of these autopsies." Both Dr. Hawes and Dr. Andrew were trained to conduct the float test, and there is a variety of techniques used to conduct the test. Dr. Hawes testified that the float test was used in all three medical examiner's offices in which she has been employed. Dr. Hawes testified that she conducted the test in this case in the manner in which she was trained at Vanderbilt University. Defendant argues that the variety of techniques used to conduct the test render it "subject to scrutiny." However, questions about the reliability of the technique go to the weight rather than the reliability of the test. *See State v. Reid*, 164 S.W.3d 286, 336 (Tenn. 2005).

The float test has been subjected to peer review and publication. Dr. Hawes testified that there are multiple articles discussing the usefulness of the float test, its limits, and in what context it must be interpreted. She further testified concerning a study from the International Journal of Legal Medicine published in 2013 which involved infants who were autopsied and on whose lungs the float test was performed. The study concluded that the lung floating test "is still a reliable indicator of a newborn's breathing." Defendant argues that the study showed a 29 percent rate of error. However, that rate of error is for false negatives, which is not at issue in this case. In the same study there were no false positive results. The study found that "a wrongful conviction for killing a newborn just on behalf of the float test cannot be expected." Dr. Hawes also identified the "Handbook of Forensic Pathology" produced by the College of American Pathologists, which discusses the float test as one used in the context of overall investigation to determine live birth versus stillborn.

Dr. Hawes and Dr. Andrew testified concerning the known factors that pathologists are trained to consider which could affect the interpretation of the float test. Such factors include whether air was introduced into a stillborn child's lungs by decomposition, mouth-to-mouth resuscitation, post-mortem handling of the body, or by some other means that could be indicated by the degree to which the lungs are inflated. As pointed out by the State, Defendant does not challenge the reliability of the float test when these factors are considered, and they were considered in this case. Defendant asserts that the scientific community does not deem the float test reliable or useful. Defendant bases this conclusion on articles and reports introduced at the *Daubert* hearing that disagreed with the use of the float test to determine live birth versus stillborn and that were critical of the test. However, these criticisms center around whether the pathologist sufficiently identifies and takes into consideration the known factors discussed above when interpreting the results of the float test. The disagreements and criticisms in the

scientific community surrounding the float test can be addressed at trial on cross-examination and goes to the weight and not admissibility of the test. Our supreme court has stated:

> The party proffering expert testimony need not establish that the expert testimony is correct, only that the expert testimony "rests upon 'good grounds.'" *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (quoting *Daubert*, 509 U.S. at 590); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994); *Burley v. Kytec Innovative Sports Equip., Inc.*, 737 N.W.2d 397, 406 (S.D. 2007). Where such a foundation exists, even if the trial court is of the view that there are better grounds for an alternative conclusion, the proffered expert testimony "should be tested by the adversary process - competing expert testimony and active cross-examination - rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz-Troche*, 161 F.3d at 85.

*State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2009); *See also Coe v. State*, 17 S.W.3d, 193, 227 (Tenn. 2000)(resolution of scientific views goes to the weight to be given an expert's testimony, not the admissibility of the testimony).

Accordingly, we conclude that the trial court properly exercised its discretion in allowing Dr. Hawes to testify as an expert concerning the float test that was used in part to determine whether the baby was born alive or stillborn in this case. Defendant is not entitled to relief on this issue.

> II.     *Admission of Defendant's Confession and Denial of Motion to Dismiss the Indictment*

Defendant contends that the trial court erred in admitting her confession and by denying her motion to dismiss the indictment because the evidence of *corpus delicti* was insufficient.

A criminal conviction cannot be based solely on a defendant's uncorroborated confession. *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). The Tennessee Supreme Court has adopted the "modified trustworthiness standard" in determining whether a confession is sufficiently corroborated. *State v. Bishop*, 431 S.W.3d 22, 58 (Tenn. 2014). In *State v. Clark*, 452 S.W.3d 268 (Tenn. 2014), the Supreme Court stated:

> In *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014), we recently clarified the corroboration rule in Tennessee. Tennessee follows the "modified trustworthiness standard" rather than the traditional *corpus delicti* rule.

*State v. Bishop*, 431 S.W.3d at 59-60. We explained that under this standard:

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

> *State v. Bishop,* 431 S.W.3d at 60. "Prima facie" evidence is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." Black's Law Dictionary 638-39 (9th ed. 2009). "Substantial evidence" is "[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." Black's Law Dictionary 640 (9th ed. 2009).

> "The corroboration requirement is a low threshold. Its purpose is twofold: to weed out false confessions to nonexistent crimes (by requiring some independent evidence that the injury occurred) and to weed out false confessions to actual crimes (by requiring some independent evidence that implicates the accused). *State v. Bishop*, 431 S.W.3d at 59-60. The standard of proof required to clear this hurdle is even lower than the "preponderance of the evidence" standard. *State v. Bishop*, 431 S.W.3d at 60 n. 33 (quoting *Smith v. United States*, 348 U.S. at 156, 75 S.Ct. 194).

*Clark*, 452 S.W.3d at 279-80.

In this case, the trial court properly admitted Defendant's confession and denied her motion to dismiss the indictment. Defendant's confession was corroborated by sufficient independent evidence. Dr Hawes testified that the baby was alive at birth establishing that an injury occurred to cause her death. Defendant told police that she smothered the baby by holding her hand over the child's mouth and nose after birth. This was corroborated by Dr. Hawes' testimony that the baby died of asphyxiation, and smothering was consistent with her autopsy findings. In her confession, Defendant said that she cleaned the bathroom after smothering the baby. Both Anna and Matthew Mooney testified that the bathroom was very clean after Defendant told them that she gave birth. Defendant told police that she placed the baby in one bag, the placenta in a bag, and a bath mat in one of the bags. These details of Defendant's confession were

corroborated by Detective Cutshaw and Anna and Matthew Mooney. Furthermore, there were photographs to corroborate those details. "The corroboration requirement is a low threshold." *Clark*, 452 S.W.3d at 280. We conclude that Defendant's confession was sufficiently corroborated. Defendant also asserts that the trial court properly denied her pretrial motion to dismiss the indictment. However, "[w]hether the [S]tate has sufficiently established the *corpus delicti* is primarily a jury question." *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999); *State v. Jeremy Lynden Myrick*, No. E2017-00588-CCA-R3-CD, 2018 WL 3430337, at *22 (Tenn. Crim. App. July 16, 2018). Therefore, the trial court properly denied the motion to dismiss the indictment. Defendant is not entitled to relief on this issue.

### III.    Sufficiency of the Evidence

Defendant argues the evidence was not sufficient to support her conviction for reckless homicide. "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn

by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

Reckless homicide is defined as the "reckless killing of another." T.C.A. § 39-13-215(a).

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(31). In this case, viewing the evidence in a light most favorable to the State, a reasonable juror could have concluded that the evidence was sufficient to support Defendant's conviction for reckless homicide.

Defendant in this case gave birth to a baby girl in the bathroom of her boyfriend's house. In her confession to Detective Cutshaw, which we have found was sufficiently corroborated, Defendant initially denied knowing that she was pregnant before she gave birth, and she said that the baby was stillborn. Defendant eventually admitted that she realized her pregnancy a few weeks before giving birth. She said that the baby was born alive and had moved a little bit before she placed her hand over the baby's mouth and nose. After a few minutes, Defendant checked the baby's pulse and found none. At no point did Defendant seek help for the child. Instead, she placed the baby in a plastic bag with some towels, and she placed the placenta in another bag and cleaned the bathroom before notifying anyone in the house that she had given birth and claiming that the baby was stillborn.

Dr. Hawes testified that her findings in total, which included inflated lungs, led her to believe that the baby was born alive and died of asphyxiation. Dr. Hawes further testified that Defendant's admission of placing her hand over the baby's mouth and nose after birth was consistent with her findings. It was her opinion that the manner of death of the baby was homicide. Defendant points to Dr Andrew's testimony and studies that disagree with the use of the float test to challenge Dr. Hawes' autopsy findings and her reliance on the float test to determine that the baby was born alive. However, the jury resolved any conflicts in the testimony in favor of the State, as was its prerogative. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Defendant contends that she was in shock and could not form the "proper culpability needed for reckless homicide because she was not aware of or did not consciously disregard a substantial and unjustifiable risk that the circumstances existed or

- 20 -

that the particular result would occur." However, there was no testimony that Defendant was in such a state shock after giving birth that she could not appreciate that holding her hand over the baby's mouth and nose immediately after birth would suffocate the child and cause death. Although there was some testimony that Defendant appeared to be in shock after the baby's death, this did not prevent her from cleaning the bathroom after giving birth, telling everyone that the baby was stillborn, and expressing fear that she would be going to jail because of searches that she had performed on her cell phone. Again, this was for the jury to decide.

We conclude that the evidence was sufficient beyond a reasonable doubt to support Defendant's conviction for reckless homicide. Defendant consciously disregarded a substantial and justifiable risk that the baby would suffocate by placing her hand over the baby's mouth and nose after birth, and the risk was of such a nature and degree that its disregard constituted a gross deviation from the ordinary standard of care. Defendant is not entitled to relief on this issue.

### IV. Sentencing

Defendant contends that the trial court erred by imposing the maximum sentence of four years for her reckless homicide conviction and by rejecting her request for probation and judicial diversion.

Our standard of review of the trial court's sentencing determinations is whether the trial court abused its discretion, and we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401 (2017), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2017).

The trial court in this case made the following findings concerning sentencing:

First of all, let me deal with the mitigating factors that have been filed and then the Court will deal with the aggravating factors that have been filed, which now I cannot but I will find momentarily.

But there is absolutely, in the record, nothing upon which a Court could excuse or justify the actions of this defendant in this case. There is absolutely no reason to excuse the defendant based upon her age alone. People much younger than this defendant bear[] children to live birth. And therefore, there is no reason to excuse her or to find any basis of leniency based upon her age as it relates to the facts of this case.

Likewise, at the trial, there was absolutely no medical evidence, no medical evidence, of any significant mental health issues that likewise could be determined to have a bearing upon this case.

Now, the mitigating factor about the facts - - it is alleged that the facts do not show a sustained intent to violate the law. The Court would hold just the opposite based upon the uncontradicted testimony in this record that this defendant admitted smothering this child and then placing this child in gar[b]age bags or covering the child up with garbage bags. And so that would indicate to the Court a sustained intent to violate the law and to cause and to cover up this death.

Now, the jury did, in its discretion - - and the Court is in no way criticizing the jury. They are the people that have to make that decision. And this Court is very respectful of a jury for doing the very best that they can, and this jury considered the facts and applied the law as they saw it. And they chose to convict her of reckless homicide which carries a range of penalties of from two to four years.

The Court would note that the affect of this defendant is much different here today than it was during the trial of this case. The Court would just note its observations. The conclusions of the Court's observations [are] that this defendant appeared that she did not understand what was going on here. That was the way she acted at trial. And the way she acts today is much different. That was the Court's impression, and that is a factor for this Court to consider. The Court must also consider as it relates to probation and as it relates to judicial deferral what the attitude of the defendant is at sentencing. And the Court would note that there is absolutely no evidence of any remorse by this defendant in this case. This defendant is sorry it happened. Being sorry that it happened is not

- 22 -

sorry for what you've done. This child was killed at birth. [. . .] There was no opportunity for this child because of its recent birth for it to have any opportunity to defend itself, and being placed in a trash bag or covered up by a trash bag is a very troubling event. And the Court, again, is troubled by the fact that there is absolutely world without end no remorse shown by this defendant, which the Court thinks is a factor which should be considered in granting or denial of probation or, in fact judicial deferral. As I say, there's not been any - - this defendant has expressed no remorse for the death, what she did to cause the death of this child. And she admitted placing her hand - - her testimony was different - - or her statement. I'm sorry. She did not testify, and the Court is not holding that against her. She has the right not to testify. And the jury did not punish her for that, by the way. The Court is satisfied that the jury didn't. But there's not been a lot said except by the Court about this baby. About this baby. A child who will never walk this earth, the most defenseless of human beings, that will never, never get to enjoy playing, growing up. A serious matter. A very serious matter. And again, no remorse.

Now, [defense counsel] is exactly right. This is a case that does, under the law, qualify in the appropriate circumstance for probation and judicial deferral. But - - and the fact that a death occurred, under the law, does not preclude either of those. The Court is well aware of that. And the Court in no way as to its - - the granting or denial of probation or judicial deferral is considering just the fact that someone died. But you must look to the totality of the circumstances of every case in deciding whether to grant probation or to deny probation or to grant judicial deferral or to deny judicial deferral.

Now - - and in addition to the extreme age and physical capabilities of this deceased in this case and the - - the Court finds - - I mean, it happened very, very quickly. The acts of this defendant show that she had no hesitation about committing an offense like this.

And for those reasons, the Court findings that the enhancement factors outweigh the mitigating factors, the Court does again find that they outweigh the mitigating factors, and the Court feels like that based upon the facts and circumstances of this case, that the maximum four years is justified and hereby orders the sentence to be served in the Department of Correction.

*Length of Sentence*

Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 701. Moreover, a trial court is "guided by - but not bound by - any applicable enhancement factors when adjusting the length of a sentence[,]" and its "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.

In this case, Defendant faced a sentencing range of two to four years as a Range I, standard offender for her conviction of reckless homicide, a Class D felony. The trial court imposed the maximum sentence of four years to be served in confinement. Defendant does not challenge the court's findings on enhancement and mitigating factors. Rather, she argues that the imposition of the maximum sentence is unfair when taken into consideration with the purposes and intent of sentencing and that her sentence was greater than deserved.

The record reflects that the trial court considered the enhancement and mitigating factors and appears to have found that the victim in this case was particularly vulnerable because of age or physical or mental disability. T.C.A. § 40-35-114(4). Application of this factor is supported by the record. As found by the trial court, the baby in this case was unable to defend herself because of her recent birth. Additionally, the record shows that Defendant abused a position of private trust in a manner that significantly facilitated the commission of the offense. T.C.A. § 40-35-114(14). Defendant was the victim's mother and did not disclose her pregnancy to the victim's father or anyone else until after she gave birth and had killed the victim. The trial court did not find any applicable mitigating factors.

Having reviewed the record before us, we conclude that the trial court clearly stated on the record its reasons for the sentence imposed, and Defendant's sentence is within the appropriate range and "justly deserved in relation to the seriousness of the offense." T.C.A. §40-35-102(1). The record reflects that the trial court considered the purposes and principles of the Sentencing Act. Therefore, the trial court's imposition of the maximum sentence of four years for reckless homicide is presumed reasonable.

*Probation*

As for the denial of full probation, "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to . . . questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A defendant "who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" T.C.A. § 40-35-102(6). In determining whether to grant or deny probation, a trial court should consider the circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). "[T]he burden of establishing suitability for probation rests with the defendant." T.C.A. § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008) (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). A trial judge must consider the following factors before imposing a sentence of incarceration:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). Additionally, the sentence imposed should be the least severe measure necessary to achieve its purpose, and the defendant's potential for rehabilitation, or lack thereof, should be considered when determining whether to grant alternative sentencing. T.C.A. 40-35-103(4) and (5). Trial judges are encouraged to use alternative sentencing when appropriate. T.C.A. 40-35-103(6).

The trial court's findings of fact in this case support a basis to conclude that Defendant was not a suitable candidate for probation and that incarceration is necessary to avoid depreciating the seriousness of the offense and to deter others from committing a similar offense. T.C.A. § 40-35-103(1)(B); *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (deferring to the trial court's decision to deny probation where the court "combined the need to avoid depreciating the seriousness of the offense with the need for deterrence and the nature and circumstances of the offense"). The trial court noted the "very serious" nature of the offense in this case where Defendant smothered her newborn baby, the "most defenseless of human beings," by placing her hand over the baby's mouth and nose after she was born. The trial court also considered the particular

circumstances of the killing which included the "extreme age and physical capabilities" of the baby and that Defendant killed her very quickly indicating no hesitation about committing the offense and then placed the baby in a garbage bag. The trial court further found that Defendant showed no remorse for her actions. The court noted that "there is absolutely world without end no remorse shown by this defendant." A lack of remorse can be utilized by a trial court during the consideration of probation. *State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994); *State v. Celeste Hall*, No. M2005-00715-CCA-R3-CD, 2005 WL 3543416, at *5 (Tenn. Crim. App. Dec. 27, 2005); and *State v. Brian Goodrich*, No. M2002-03017-CCA-R3-CD, 2004 WL 367719, at *3 (Tenn. Crim. App. Feb. 27, 2004).

The trial court did not abuse its discretion in denying probation in this case given Defendant's lack of remorse, combined with the need to avoid depreciating the seriousness of the offense.

*Judicial Diversion*

The standard of review in *Bise* extends to decisions involving judicial diversion as well. *Caudle*, 388 S.W.3d at 278-79. ("[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence."); *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014)("the abuse of discretion standard accompanied by a presumption of reasonableness applies to all sentencing decisions, including the grant or denial of judicial diversion, when the trial court properly supports its decision on the record in accordance with the purposes and principles of sentencing").

Tennessee Code Annotated section 40-35-313 outlines the requirements for judicial diversion. After a qualified defendant is either found guilty or pleads guilty to a misdemeanor or a class C, D, or E felony, a trial court has the discretion to defer further proceedings and place that defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A). Eligibility for judicial diversion does not entitle the defendant to judicial diversion as a matter of right. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Rather, the statute states that a trial court "may" grant judicial diversion in appropriate cases. *See* T.C.A. § 40-35-313(a)(1)(A). When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's mental and physical health, (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants, and (7) whether judicial diversion will serve the interests of the public as well as the defendant. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing *Parker*, 932 S.W.2d at 958). The record must reflect that the trial court

considered and weighed all these factors in arriving at its decision. *Electroplating, Inc.*, 990 S.W.2d at 229 (citing *State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by *State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000)).

As noted above, our supreme court in *King* has concluded that the proper standard of review for judicial diversion decisions is that established in *Bise*. The *King* Court explained,

> [W]hen the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision. Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.
>
> If, however, the trial court fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard, which merely looks for "any substantial evidence" to support the trial court's decision, is not appropriate. . . . In those instances, appellate courts may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration.

*King*, 432 S.W.3d at 327-28 (internal citations omitted) (footnote omitted).

We have set forth in detail the trial court's findings of fact regarding whether to grant judicial diversion. Here, the trial court considered the *Parker* and *Electroplating* factors as argued by Defendant at the sentencing hearing, and the trial court identified those factors that it found applicable to this case. It is not necessary that a trial court recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness. *King*, 432 S.W.3d at 323. As noted above, the trial court was particularly concerned with Defendant's lack of remorse, which the trial court obviously believed militated against Defendant's potential for rehabilitation. Lack of remorse relates to Defendant's amenability to correction. *State v. Kristi Dance Oakes*, No. E2006-01795-CA-R3-CD, 2007 WL 2792934, at *9 (Tenn. Crim. App. Sept. 27, 2007)(citing *State v. Edward Arnold Rivera*, No. W2001-00857-CCA-R9-CD, 2002 WL 1482655, at *3)(Tenn. Crim. App. Feb. 4, 2002)("Lack of remorse is an appropriate factor for a trial court to consider in deciding whether to grant

judicial diversion.")). There is substantial evidence in the record to support the trial court's decision, and applying a presumption of reasonableness, we affirm the decision to deny judicial diversion.

Having reviewed the record and applied the applicable law to the trial court's sentencing determinations, we find no error by the trial court in sentencing Defendant to four years in confinement for her reckless homicide conviction. Defendant is not entitled to relief in this appeal.

CONCLUSION

Based on foregoing analysis, we affirm the judgment of the trial court.


_____
THOMAS T. WOODALL, JUDGE